## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2473CV00151

RICHARD SANZO,

Plaintiff,

v.

ATLANTIC CAPES FISHERIES, INC.,
F-V ENTERPRISE, LLC, and
ATLANTIC HARVESTERS, LLC

Defendant.

BRISTOL,SS SUPERIOR COURT
FILED

FEB 2 0 2024

JENNIFER A. SULLIVAN, ESQ.
CLERK / MAGISTRATE

### **COMPLAINT AND DEMAND FOR TRIAL BY JURY**

Now comes the Plaintiff in the above-captioned matter and for his Complaint states:

### **PARTIES**

1.  Plaintiff Richard Sanzo (hereinafter referred to as "Plaintiff" and/or "Mr. Sanzo") is an individual who resides at 15521 Lawson Creek Lane, Smithfield, Virginia 23430.

2.  Defendant ATLANTIC CAPES FISHERIES, INC. is a New Jersey corporation doing business in the Commonwealth of Massachusetts with a principal office located at 985 Ocean Drive, Cape May, New Jersey 08204, and at all times relevant to this matter, maintained a registered office in the Commonwealth of Massachusetts at 140 Waldron Road, Fall River, Massachusetts 02720, with registered agent Barry Cohen.

3.  Defendant ATLANTIC CAPES FISHERIES, INC. owns seafood offloading or processing facilities in New Bedford, Massachusetts, and Fall River,

1



Massachusetts, and, ATLANTIC CAPES FISHERIES, INC. maintains its Marketing Office in Fall River, Massachusetts.

4.     At all times hereafter referred to, Defendant ATLANTIC CAPES FISHERIES, INC. owned, operated and/or controlled the F/V ENTERPRISE.

5.     The F/V ENTERPRISE ("the Vessel") is a commercial fishing vessel which maintains a homeport in Fairhaven, Massachusetts, and it is the vessel upon which Plaintiff Richard Sanzo was injured.

6.     The F/V ENTERPRISE does considerable business in Massachusetts.

7.     F-V ENTERPRISE, LLC, is a New Jersey corporation doing business in the Commonwealth of Massachusetts.

8.     F-V ENTERPRISE, LLC, maintains a principal office located at 985 Ocean Drive, Cape May, New Jersey 08204.

9.     At all times hereafter referred to, Defendant F-V ENTERPRISE, LLC, owned, operated and/or controlled the F/V ENTERPRISE.

10.    ATLANTIC HARVESTERS, LLC, is a Rhode Island corporation doing business in the Commonwealth of Massachusetts.

11.    ATLANTIC HARVESTERS, LLC, maintains a principal office located at 985 Ocean Drive, Cape May, New Jersey 08204, and at all times relevant to this matter ATLANTIC HARVESTERS, LLC, maintained an office at 50 Middle Street, Fairhaven, Massachusetts 02719.

12.    At all times hereafter referred to, Defendant ATLANTIC HARVESTERS, LLC, owned, operated and/or controlled the F/V ENTERPRISE.

13.   On March 2, 2021, in Bristol County, Massachusetts, the Defendants hired Mr. Sanzo to work as a deckhand on the F/V ENTERPRISE.

## JURISDICTION

14.   This Court has personal jurisdiction over the Defendants because they have purposefully availed themselves of the benefits, profits, and privileges deriving from their business activities in the Commonwealth of Massachusetts and Plaintiff's injuries alleged herein arise from their business activities within the Commonwealth of Massachusetts.

15.   This action is being brought against the Defendant pursuant to the Merchant Marine Act of 1920, commonly known as the Jones Act, 46 U.S.C. §30104 and this Court has concurrent jurisdiction with federal district courts to adjudicate other related claims under the "savings to suitors" clause of 28 U.S.C. § 1331(1).

## VENUE

16.   Venue is proper in this county in accordance with G.L. c. 223, §1 because at all relevant times the Defendants maintained a usual place of business in Bristol County, Massachusetts.

17.   And, venue is proper in this county in accordance with G.L. c. 223, §8 because the Defendants have sufficient contacts with Bristol County by nature of their substantial business engagements therein.

## STATEMENT OF FACTS

18.   Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

3

19. Plaintiff worked as a deckhand/commercial fisherman aboard the commercial fishing vessel F/V ENTERPRISE. On or about March 4, 2021, while in the performance of his duties as a commercial fisherman/deckhand, Mr. Sanzo sustained severe and personal injuries, including a traumatic brain injury.

*BACKGROUND FACTS*

20. The F/V ENTERPRISE is a commercial clam fishing vessel.

21. The F/V ENTERPRISE does frequent business in Massachusetts.

22. The F/V ENTERPRISE maintains its home port in Fairhaven, Massachusetts.

23. During a commercial fishing trip, the captain and/or mate are in charge of all vessel operations.

24. The captain retains supervisory responsibility over the mate and crew at all times during a commercial fishing trip.

25. The mate takes control of vessel operations when the captain is on break.

26. The mate has supervisory responsibility over the crew during a commercial fishing trip.

27. The F/V ENTERPRISE collects clams by dragging a dredge along the ocean floor.

28. On the F/V ENTERPRISE, the dredge is lowered into and lifted out of the water using controls in the Vessel's wheelhouse.

29. When the dredge is lowered into or lifted out of the water, that operation is controlled by the captain or mate of the Vessel from the wheelhouse.

30. When in control of the Vessel, it is the captain/mate's responsibility to ensure that the lowering or lifting of the Vessel's fishing dredge is done safely.

4

31.    On the F/V ENTERPRISE, there is a camera pointed at the stern of the Vessel which allows the captain/mate to monitor the operations of the dredge from the Vessel's wheelhouse.

32.    On the F/V ENTERPRISE, there is a second camera on the deck of the Vessel, which allows that captain/mate to monitor, from the Vessel's wheelhouse, the movements and behaviors of the Vessel's deckhands, while working on deck.

33.    When the Vessel's fishing dredge is in the water, the captain/mate must be vigilant to possible dangers.

34.    The dredge is attached to the Vessel by a hoist wire cable, a water hose, and a tow line.

35.    The tow line on the Vessel is made of polypropylene.

36.    The tow line on the Vessel is made of polypropylene because polypropylene floats.

37.    When the dredge is lowered into or lifted out of the water, that operation is done by using a hydraulic process to control the hoist wire cable.

38.    The dredge is not lowered into or lifted out of the water using the tow line.

39.    The dredge is not lowered into or lifted out of the water using the water hose.

40.    When the dredge is on the ocean floor, the tow line is used to drag the dredge behind the Vessel.

41.    When the dredge is on the ocean floor and the tow line is being used to drag the dredge, there is slack in the hoist wire cable.

42.    When the dredge is on the ocean floor, there is slack in the hoist wire cable because, if the hoist wire cable were shorter than the tow line, then the Vessel would be using the hoist wire cable, not the tow line, to drag the dredge.

43. When the captain or mate lifts the dredge back to the Vessel, that operation is called a haul back.

44. During a haul back, the captain/mate uses a hydraulic process to bring in the hoist wire cable.

45. A haul back creates slack in the tow line.

46. A haul back always creates slack in the tow line because, when the captain/mate uses a hydraulic process to bring in the hoist wire cable, he makes the hoist wire cable shorter than the tow line.

47. Slack in the tow line needs to be managed.

48. Generally speaking, because the tow line is made of polypropylene, the slack in the tow line tends to float on the water's surface.

49. However, if slack in the tow line is not properly managed, it can foul the Vessel's propeller.

50. It is the captain's/mate's responsibility to manage the slack in the tow line.

51. During a haul back operation, the captain/mate must remain vigilant in monitoring the slack in the tow line.

52. The captain/mate can manage the slack in the tow line by keeping the Vessel moving forward with sufficient speed.

53. When the captain/mate drives the Vessel forward with sufficient speed, the slack in the tow line will remain astern of the Vessel and away from the Vessel's propeller.

54.    If the captain/mate does not drive the Vessel forward with sufficient speed, the slack in the tow line, subject to prevailing currents, tides, and winds, will bunch up near the stern of the vessel.

55.    Once the tow line has bunched up near the stern of the vessel, there is a risk that the tow line will find its way to the Vessel's propeller.

56.    Once the tow line has bunched up near the stern of the vessel, bad weather, such as existed at the time of the accident, can cause the tow line to foul the propeller.

57.    Once the tow line has bunched up near the stern of the vessel, if the vessel is facing the same direction as the tide, the tide can cause the tow line to foul the propeller.

58.    On March 2, 2021, in Massachusetts, the Defendants hired Mr. Sanzo to work as a deckhand on the F/V ENTERPRISE.

59.    The fishing trip relevant to this complaint began in Fairhaven, Massachusetts, on March 2, 2021.

*THE DAY THAT MR. SANZO WAS INJURED*

60.    On March 4, 2021, the captain/mate of the Vessel was in control of the Vessel's operations from the wheelhouse.

61.    On March 4, 2021, the captain/mate of the Vessel engaged in a haul back.

62.    During the haul back, the captain/mate allowed the tow line, attached to the Vessel's dredge, to slacken.

63.    The captain/mate failed to properly control the slack tow line.

64.    The captain/mate failed to keep the vessel moving forward fast enough to maintain enough distance between the Vessel and the slack tow line.

65. The captain/mate allowed the slack tow line to bunch up near the stern of the vessel.

66. Once the slack tow line was bunched up near the stern of the vessel, the captain/mate did not disengage the power to the Vessel's propeller.

67. The captain/mate ordered Mr. Richard Sanzo to manually haul in the tow line.

68. When Mr. Sanzo was ordered to manually haul in the tow line, the propeller was still spinning.

69. This was Mr. Sanzo's first trip working on the F/V ENTERPRISE.

70. Mr. Sanzo was new to the Vessel's equipment and layout.

71. Mr. Sanzo had only been working on the F/V ENTERPRISE since March 2, 2021 - two days before he was injured.

72. This was Mr. Sanzo's first time working on a dredge clamming vessel.

73. Mr. Sanzo had not been provided proper training on how to safely handle the tow line during an emergency situation.

74. When Mr. Sanzo was ordered to manually haul in the tow line, he was the only person on the deck of the vessel.

75. When Mr. Sanzo was ordered to manually haul in the tow line, the captain/mate was in the wheelhouse, at the controls.

76. When Mr. Sanzo was ordered to manually haul in the tow line, the third person "off watch," either sleeping or resting in the Vessel's bunkhouse.

77. The mate was new to working on the F/V ENTERPRISE.

78. The mate had only been working on the F/V ENTERPRISE since March 2, 2021 – two days before Mr. Sanzo was injured.

79.   This was the mate's first time working on a dredge clamming vessel.

80.   The captain was new to being captain of the F/V ENTERPRISE.

81.   The captain first became the captain of the F/V ENTERPRISE in November 2020, less than 6 months before this accident.

82.   The tow line was in the water and it was slack.

83.   The tow line was in the water because it had been used to drag the dredge across the ocean floor.

84.   When the tow line is used to drag the dredge across the ocean floor, it drags the dredge under tension.

85.   The tow line holds the dredge under tension between the ocean floor and a hitch high up on a part of the Vessel called the A-frame.

86.   The hitch, to which the tow line is tied, is approximately 12-15 feet above the deck.

87.   The hitch, to which the tow line is tied, is, on the vessel, forward of a steel bulkhead called the doghouse.

88.   When the tow line drags the dredge under tension, there cannot be, between the hitch and the dredge, any part of the tow line touching the deck of the Vessel.

89.   Certainly, when the tow line is under tension, there cannot be, between the hitch and the dredge, any part of the tow line touching the deck of the Vessel forward of the doghouse.

90.   When the tow line slackens, the weight of the tow line remains in the water, astern of the Vessel.

91.   To comply with the captain/mate's instructions, Mr. Sanzo was required to go to the stern of the vessel to seize the tow line.

92.  Because of the height of the tow line hitch and its relative position to the doghouse, following the captain's/mate's instruction to manually haul in the tow line required that Mr. Sanzo seize the tow line astern of the doghouse.

93.  The design and location of the doghouse created a danger zone for deckhands manually handling the tow line.

94.  If the doghouse had been designed or located differently, this danger zone could have been mitigated or eliminated.

95.  The doghouse and danger zone created by it were not equipped with any guards meant to prevent injury by entanglement with the tow line.

96.  Neither of the Vessel's video cameras were positioned to give the captain/mate the ability to monitor the danger zone from the wheelhouse, leaving the danger zone in a blind spot.

97.  Mr. Sanzo was not trained to avoid the danger zone.

98.  The Vessel was not marked with any visual indicators warning deckhands to avoid the danger zone.

99.  The vessel was equipped with a loudspeaker and hailer to allow for verbal communication between the crew members on deck and the vessel operator in the wheelhouse.

100.  Mr. Sanzo was in the cameras' blind spot for some period of time.

101.  The captain/mate did not order Mr. Sanzo to vacate the blind spot.

102.  While Mr. Sanzo was astern of the doghouse, the Vessel's tow line fouled the Vessel's propeller.

103.   The tow line fouled the propeller because the captain/mate failed to manage the slack in poor weather conditions.

104.   The tow line fouled the propeller because the captain/mate failed to drive the Vessel forward with sufficient speed.

105.   The tow line fouled the propeller because the captain/mate was fishing with the tide, instead of against it.

106.   The tow line fouled the propeller because the captain/mate mishandled the dredge and its relationship with the tow line slack.

107.   The tow line fouled the propeller because the captain/mate allowed the propeller to continue to spin under power while Mr. Sanzo was manually hauling the tow line on the deck of the Vessel.

108.   Because the captain/mate had not disengaged the power from the Vessel's propeller, after the tow line fouled the Vessel's propeller, the tow line rapidly tightened.

109.   When the tow line rapidly tightened, Mr. Sanzo's head was pinned against the Vessel by the tight line.

110.   Mr. Sanzo was not provided a hard hat or other cranial protection, nor was he required to wear head protection.

111.   Mr. Sanzo's head was pinned against the Vessel's doghouse.

112.   Mr. Sanzo experienced a traumatic brain injury and other physical injuries.

113.   By failing to manage the slacked tow line, the captain/mate created a dangerous situation.

114. After failing to manage the tow line, the captain's/mate's failure to disengage the power of the propeller as the tow line gathered at the stern of the vessel made the situation even more dangerous.

115. The captain/mate should not have ordered Mr. Sanzo to manually haul in the tow line under these conditions.

116. The captain/mate should not have ordered Mr. Sanzo to haul in the tow line by himself.

117. The captain/mate should have woken up the third person aboard the Vessel to assist with this emergency situation.

118. The Vessel was not staffed with a sufficient number of experienced crew members to handle such situations.

119. The captain/mate should not have ordered Mr. Sanzo to haul in the tow line by himself when, if Mr. Sanzo followed the captain's/mate's orders, that would put him outside the view of any cameras which the captain/mate could use to monitor activity on the deck of the Vessel.

120. Once the captain/mate lost sight of Mr. Sanzo, they should have ordered him to vacate the blind spot.

121. Once the captain/mate was unable to locate Mr. Sanzo, they should have suspended operations, or at least put the propeller in neutral, until they were able to ensure that Mr. Sanzo was in a position of safety.

122. The Vessel was not equipped with sufficient cameras to allow the captain/mate in the wheelhouse to monitor the movements of crewmembers on all areas of the deck, including surrounding the doghouse.

123. The Vessel was not equipped with sufficient audio communications technology to allow the captain/mate to communicate with the other persons aboard the Vessel.

124. After Mr. Sanzo was injured, the captain/mate of the Vessel waited hours before making a call for emergency medical assistance.

125. While the captain/mate delayed in calling for medical assistance, Mr. Sanzo was suffering from a traumatic brain injury.

### COUNT I: JONES ACT NEGLIGENCE
### (RICHARD SANZO v. ATLANTIC CAPES FISHERIES, INC., F-V ENTERPRISE, LLC, and ATLANTIC HARVESTERS, LLC)

126. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 - 125 as if they were fully restated herein.

127. Defendants owed a duty to Plaintiff to, among other things, provide a reasonably safe place to work.

128. Defendants breached this to duty to Plaintiff, which in turn caused him to suffer injuries.

129. More specifically, personal injuries sustained by Plaintiff were not caused by any fault on his part but were caused by the negligence of Defendants and its agents, servants and/or employees as follows:

(a)    Failing to provide Plaintiff with a reasonably safe place in which to work;

(b)    Failing to provide adequate supervision;

(c)    Failing to adequately staff the vessel for its safe operation;

(d)    Failing to adequately staff the vessel with experienced captain, mate, and crew;

13

(e)   Failing to adequately staff the vessel during the emergency situation in which Mr. Sanzo was injured;

(f)   Failing to provide adequate training to its captain to prevent injuries to crewmembers;

(g)   Failing to provide adequate training to crewmembers;

(h)   Failing to handle the dredge with proper care;

(i)   Failing to manage the tow line slack;

(j)   Failing to monitor the tow line slack;

(k)   Fishing with the tide, creating an unnecessary risk of fouling the tow line in the propeller;

(l)   Fishing during poor conditions, creating an unnecessary risk of fouling the tow line in the propeller;

(m)   Failing to drive the Vessel forward with sufficient speed so as to prevent the tow line slack from fouling the propeller;

(n)   Failing to disengage the power to the propeller after it became clear that there was a danger of the propeller being fouled by the tow line;

(o)   Ordering Mr. Sanzo to manually haul in the tow line while the tow line was at risk of fouling the propeller;

(p)   Ordering Mr. Sanzo to manually haul the tow line in by himself;

(q)   Ordering Mr. Sanzo to enter what was known to the captain to be a danger zone;

(r)   Failing to design the vessel to mitigate or eliminate the danger zone created by the tow line hitch and its relative position to the doghouse;

14

(s)     Failing to equip the Vessel and the doghouse with any guards designed to prevent injury by entanglement with the tow line;

(t)     Failing to use visual indicators to warn deckhands of the danger zone;

(u)     Failure to train deckhands to avoid the danger zone;

(v)     Failing to provide Mr. Sanzo with a hardhat or require the use of cranial protection;

(w)     Failing to equip the Vessel with sufficient cameras to allow the captain/mate to monitor the movements of crew working on deck;

(x)     Failing to equip the Vessel with sufficient audio communications technology to allow the captain/mate to communicate with the other persons aboard the Vessel;

(y)     Failing to order Mr. Sanzo to vacate known blind spots in the Vessel's camera monitoring system once he was known to have entered one;

(z)     Delaying the call for emergency medical assistance.

130.   As a result of the negligence of Defendants, Plaintiff was caused to suffer severe personal injuries, including but not limited to, a traumatic brain injury.

131.   As a result of said injuries, Plaintiff has suffered pain of body and anguish of his mind, incurred medical expenses, will continue to incur future medical expenses, and has sustained and will continue to sustain other damages that will be shown at trial.

132.   As a further result of said injuries, Plaintiff has lost a considerable amount in wages from his employment. Additionally, Plaintiff claims damages in the amount to be shown by evidence at trial or his injuries; for his mental and physical pain and

suffering, past and present; past loss earnings, loss of future earning capacity, and for his expenses of medical treatment.

133.   This cause of action is brought under the Merchant Marine Act of 1920, commonly known as the Jones Act, 46 U.S.C. §30104.

**WHEREFORE**, Plaintiff, Richard Sanzo, demands judgment against Defendants for all recoverable compensatory damages to fully and fairly compensate him for his injuries and damages, in addition to court costs, pre- and post-judgment interest, attorneys' fees, and such other relief as the Court deems just.

<u>**COUNT II: GENERAL MARITIME LAW – UNSEAWORTHINESS**</u>
**(RICHARD SANZO v. ATLANTIC CAPES FISHERIES, INC., F-V ENTERPRISE, LLC, and ATLANTIC HARVESTERS, LLC)**

134.   Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 - 125 as if they were fully restated herein.

135.   Defendants owed a duty to Plaintiff to, among other things, provide a vessel and appurtenances reasonably fit for their intended use.

136.   A vessel is not fit for its intended use when the physical condition of the vessel or its appurtenances is defective or when aspects of the vessel's working conditions pose a risk of injury to the vessel's employees.

137.   Defendants breached this to duty to Plaintiff, which in turn caused him to suffer injuries.

138.   More specifically, personal injuries sustained by Plaintiff were due to no fault of his, but were caused by the unseaworthiness of the F/V ENTERPRISE.

   (a)   Failing to provide Plaintiff with a reasonably safe place in which to work;

   (b)   Failing to provide adequate supervision;

16

(c)     Failing to adequately staff the vessel for its safe operation;

(d)     Failing to adequately staff the vessel with experienced captain, mate, and crew;

(e)     Failing to adequately staff the vessel during the emergency situation in which Mr. Sanzo was injured;

(f)     Failing to provide adequate training to its captain to prevent injuries to crewmembers;

(g)     Failing to provide adequate training to crewmembers;

(h)     Failing to handle the dredge with proper care;

(i)     Failing to manage the tow line slack;

(j)     Failing to monitor the tow line slack;

(k)     Fishing with the tide, creating an unnecessary risk of fouling the tow line in the propeller;

(l)     Fishing during poor conditions, creating an unnecessary risk of fouling the tow line in the propeller;

(m)     Failing to drive the Vessel forward with sufficient speed so as to prevent the tow line slack from fouling the propeller;

(n)     Failing to disengage the power to the propeller after it became clear that there was a danger of the propeller being fouled by the tow line;

(o)     Ordering Mr. Sanzo to manually haul in the tow line while the tow line was at risk of fouling the propeller;

(p)     Ordering Mr. Sanzo to manually haul the tow line in by himself;

(q)    Ordering Mr. Sanzo to enter what was known to the captain to be a danger zone;

(r)    Failing to design the vessel to mitigate or eliminate the danger zone created by the tow line hitch and its relative position to the doghouse;

(s)    Failing to equip the Vessel and the doghouse with any guards designed to prevent injury by entanglement with the tow line;

(t)    Failing to use visual indicators to warn deckhands of the danger zone;

(u)    Failure to train deckhands to avoid the danger zone;

(v)    Failing to provide Mr. Sanzo with a hardhat or require the use of cranial protection;

(w)    Failing to equip the Vessel with sufficient cameras to allow the captain/mate to monitor the movements of crew working on deck;

(x)    Failing to equip the Vessel with sufficient audio communications technology to allow the captain/mate to communicate with the other persons aboard the Vessel;

(y)    Failing to order Mr. Sanzo to vacate known blind spots in the Vessel's camera monitoring system once he was known to have entered one;

(z)    Delaying the call for emergency medical assistance.

139.    As a result of the unseaworthiness of F/V ENTERPRISE, Plaintiff was caused to suffer severe personal injuries, including but not limited to, a traumatic brain injury.

140.    As a result of said injuries, Plaintiff has suffered pain of body and anguish of his mind, incurred medical expenses, will continue to incur future medical expenses,

and has sustained and will continue to sustain other damages that will be shown at trial.

141. As a further result of said injuries, Plaintiff has lost a considerable amount in wages from his employment. Additionally, Plaintiff claims damages in the amount to be shown by evidence at trial or his injuries; for his mental and physical pain and suffering, past and present; past loss earnings, loss of future earning capacity, and for his expenses of medical treatment.

142. The cause of action is brought under the General Maritime Law for Unseaworthiness.

**WHEREFORE**, Plaintiff, Richard Sanzo, demands judgment against Defendants for all recoverable compensatory damages to fully and fairly compensate him for his injuries and damages, in addition to court costs, pre- and post-judgment interest, attorneys' fees, and such other relief as the Court deems just.

## COUNT III: MARITIME NEGLIGENCE
### (RICHARD SANZO v. ATLANTIC CAPES FISHERIES, INC., F-V ENTERPRISE, LLC, and ATLANTIC HARVESTERS, LLC)

143. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 - 125 as if they were fully restated herein.

144. Defendants owed a duty to Plaintiff to, among other things, provide a reasonably safe place to work.

145. Defendant breached this to duty to Plaintiff, which in turn caused him to suffer injuries.

19

146.   More specifically, personal injuries sustained by Plaintiff were not caused by any

fault on his part but were caused by the negligence of Defendants and their agents,

servants and/or employees as follows:

(a)   Failing to provide Plaintiff with a reasonably safe place in which to work;

(b)   Failing to provide adequate supervision;

(c)   Failing to adequately staff the vessel for its safe operation;

(d)   Failing to adequately staff the vessel with experienced captain, mate, and

crew;

(e)   Failing to adequately staff the vessel during the emergency situation in

which Mr. Sanzo was injured;

(f)   Failing to provide adequate training to its captain to prevent injuries to

crewmembers;

(g)   Failing to provide adequate training to crewmembers;

(h)   Failing to handle the dredge with proper care;

(i)   Failing to manage the tow line slack;

(j)   Failing to monitor the tow line slack;

(k)   Fishing with the tide, creating an unnecessary risk of fouling the tow line in

the propeller;

(l)   Fishing during poor conditions, creating an unnecessary risk of fouling the

tow line in the propeller;

(m)   Failing to drive the Vessel forward with sufficient speed so as to prevent the

tow line slack from fouling the propeller;

(n)    Failing to disengage the power to the propeller after it became clear that there was a danger of the propeller being fouled by the tow line;

(o)    Ordering Mr. Sanzo to manually haul in the tow line while the tow line was at risk of fouling the propeller;

(p)    Ordering Mr. Sanzo to manually haul the tow line in by himself;

(q)    Ordering Mr. Sanzo to enter what was known to the captain to be a danger zone;

(r)    Failing to design the vessel to mitigate or eliminate the danger zone created by the tow line hitch and its relative position to the doghouse;

(s)    Failing to equip the Vessel and the doghouse with any guards designed to prevent injury by entanglement with the tow line;

(t)    Failing to use visual indicators to warn deckhands of the danger zone;

(u)    Failure to train deckhands to avoid the danger zone;

(v)    Failing to provide Mr. Sanzo with a hardhat or require the use of cranial protection;

(w)    Failing to equip the Vessel with sufficient cameras to allow the captain/mate to monitor the movements of crew working on deck;

(x)    Failing to equip the Vessel with sufficient audio communications technology to allow the captain/mate to communicate with the other persons aboard the Vessel;

(y)    Failing to order Mr. Sanzo to vacate known blind spots in the Vessel's camera monitoring system once he was known to have entered one;

(z)    Delaying the call for emergency medical assistance.

147. As a result of the negligence of Defendants, Plaintiff was caused to suffer severe personal injuries, including but not limited to, a traumatic brain injury.

148. As a result of said injuries, Plaintiff has suffered pain of body and anguish of his mind, incurred medical expenses, will continue to incur future medical expenses, and has sustained and will continue to sustain other damages that will be shown at trial.

149. As a further result of said injuries, Plaintiff has lost a considerable amount in wages from his employment. Additionally, Plaintiff claims damages in the amount to be shown by evidence at trial or his injuries; for his mental and physical pain and suffering, past and present; past loss earnings, loss of future earning capacity, and for his expenses of medical treatment.

150. This cause of action is brought under the general common law of maritime negligence.

**WHEREFORE**, Plaintiff demands judgment against Defendants for all recoverable compensatory damages to fully and fairly compensate him for his injuries and damages, in addition to court costs, pre- and post-judgment interest, attorneys' fees, and such other relief as the Court deems just.

### COUNT IV: GENERAL MARITIME LAW – MAINTENANCE AND CURE
### (RICHARD SANZO v. ATLANTIC CAPES FISHERIES, INC., F-V ENTERPRISE, LLC, and ATLANTIC HARVESTERS, LLC)

151. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 - 125 as if they were fully restated herein.

152. As a result of the personal injuries described above, the Plaintiff has incurred and will continue to incur expenses for his maintenance and cure.

**WHEREFORE**, Plaintiff, Richard Sanzo, demands judgment against the Defendants in an amount sufficient to fully and fairly compensate him for maintenance and cure, together with costs, interest and reasonable attorney fees, and punitive damages if maintenance and cure are wrongfully terminated in the future.

<u>**COUNT V: COMPLAINT FOR DECLARATORY JUDGMENT**</u>
<u>**UNDER M.G.L. c. 231A and M.G.L. c. 251 §2(B)**</u>
**(RICHARD SANZO v. ATLANTIC CAPES FISHERIES, INC., F-V ENTERPRISE, LLC, and ATLANTIC HARVESTERS, LLC)**

153. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 - 125 as if they were fully restated herein.

154. On March 2, 2021, when Plaintiff Richard Sanzo presented himself to work for the F/V ENTERPRISE, ATLANTIC CAPES FISHERIES, INC., Boat Manager Kevin Krauss handed Mr. Sanzo two documents for Mr. Sanzo to sign.

155. Both documents were marked with versions of ATLANTIC HARVESTERS, LLC, letterhead.

156. Both documents were given in Mr. Sanzo in Bristol County, Massachusetts.

157. One was titled "Continuing Crew Terms of Employment for All Voyages," and the other was titled "Acknowledgment of Crew Terms."

158. Scanned copies of these documents, provided to Plaintiff's counsel by counsel for the Defendants, are attached as Exhibits A and B respectively.

159. The first page of "Continuing Crew Terms of Employment for All Voyages" states "This agreement is made between the undersigned and the vessel(s) owner(s) and operator/employer."

160. The Defendants are the vessel owners and operators of the F/V ENTERPRISE.

161.   In Bristol County, Massachusetts, on March 2, 2021, Plaintiff Richard Sanzo signed those two documents.

162.   Mr. Sanzo signed these documents before he was injured on the Defendants' Vessel.

163.   At the time Mr. Sanzo signed those two documents, there existed a significant disparity of bargaining power between Mr. Sanzo and the Defendants.

164.   The Defendants were/are corporations engaged in businesses of maritime commerce.

165.   The Defendants had employed a lawyer to help them draft these two writings.

166.   Mr. Sanzo was not represented by a union.

167.   Prior to these writings being signed, no legal advisor reviewed these writings on Mr. Sanzo's behalf.

168.   If the Defendants' desired "Crew Terms" were enforced against Mr. Sanzo, it would be oppressive.

169.   Mr. Sanzo had no meaningful choice and was subjected to unfair surprise.

170.   The document titled "Continuing Crew Terms of Employment for All Voyages" called for the signatory to give up certain legal rights which are granted to him by law, and called for the signatory to consent to limitations on the legal rights of seamen where such limitations would be contrary to maritime law.

171.   Provision sixteen of the "Continuing Crew Terms of Employment for All Voyages" reads in part: "Failure to give written notice to the Captain with [sic] seven (7) days of an injury or illness shall release the vessel operator and vessel owner from any obligation to pay maintenance and cure. In the event of an injury or illness, I agree

to cooperate fully in my recovery and to reach an amicable settlement with the vessel owner and operator."

172.   Such a provision, attempting to limit Defendants' maintenance and cure obligation, is plainly illegal under maritime law. Vaughan v. Atkinson, 369 U.S. 527, 533 (1962) (in regards to an injured seaman's right to maintenance and cure, "no agreement is competent to abrogate the incident").

173.   Demonstrating the imbalance of bargaining power between the parties, the writing asks the signatory to agree to "reach an amicable settlement," prior to any injury or illness arising.

174.   Such a provision, which seeks to have the signatory waive his rights to a trial and waive his rights to have a jury or judge award damages (under the U.S. Constitution, Massachusetts Constitution, Jones Act, doctrine of Maintenance and Cure, the doctrine of Unseaworthiness, the common law, and other federal and state laws) cannot give rise to an enforceable agreement of any kind, and only serves to mislead the signatory.

175.   Asking Mr. Sanzo to agree to provision sixteen rendered these terms and this entire writing procedurally and substantively unconscionable.

176.   Provision ten of the document titled "Continuing Crew Terms of Employment for All Voyages" called for Mr. Sanzo to agree that the Defendants' vessel was seaworthy in contravention of the Defendants' absolute non-delegable duty to provide a seaworthy vessel.  Seas Shipping Co. v. Sieracki, 328 U.S. 85, 100 (1946); United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 616 (1959); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960).

177. Before the Vessel had left port and before Mr. Sanzo had participated in any of the Vessel's on-board operations, provision ten of the document called for the signatory to agree that "I have familiarized myself with the vessel, its equipment and safety procedures and based upon my experience, I find that the vessel is fit for its intended fishery and waters."

178. Here, Defendants' Vessel was not seaworthy, as outlined in Count II of this complaint.

179. Asking Mr. Sanzo to agree to such an obvious falsehood, and make an acknowledgement contrary to maritime law, rendered this term and this entire writing procedurally and substantively unconscionable.

180. Provision three of the document titled "Continuing Crew Terms of Employment for All Voyages" describes the possible future benefit that could go to Mr. Sanzo for providing his labor to the Defendants for multiple days at sea. It reads: "I understand and agree that I have been hired by the Captain and that the Captain and crew are working for a percentage (%) of the catch, less certain expenses, including but not limited to fuel, oil, food, packaging, and consumables. My full, or part, share shall be determined solely by the Captain at the time of settlement. My full or part share shall be paid at the end of the trip based on my position, duties, and my performance of the duties assigned to me by the Captain, and my cooperation and coordination with the rest of the crew."

181. Because Mr. Sanzo's pay, if he is to receive any pay at all, was, according to this writing, solely for the Defendants' captain to decide at the end of a days long ocean voyage, the Defendants only offered illusory consideration to Mr. Sanzo.

182. Therefore, these signed writings do not create an enforceable contract.

183. Asking Mr. Sanzo to agree to labor for illusory consideration rendered this term and this entire writing procedurally and substantively unconscionable.

184. The document titled "Continuing Crew Terms of Employment for All Voyages" included numerous assertions of fact which it asked Mr. Sanzo to agree were true, when they, in fact, were not true, or were misleading.

    a. In the document called "Continuing Crew Terms of Employment for All Voyages," the first provision states, "I understand and agree that I am a self-employed fisherman..."

    b. While Mr. Sanzo was hired to work on a clam dredging vessel, the eighth provision states, "I certify that I am physically able to perform the duties of a crewmember aboard a scallop/fish trawler..."

    c. *Before any such training had been given*, the Defendants asked the Plaintiff to acknowledge provision fourteen, which states, "The Captain has instructed me and I certify that I completely understand the vessel's safety procedures and location and use of safety equipment including the following: A. Life raft locations and operations; B. Survival suit location and use; C. General alarm, fire, emergency signals, abandon ship signal; D. Distress radio calls; E. Firefighting; F. Location of First Aid Kid; G. Rough weather procedures; H. Flooding procedures; I. Procedures for man overboard; J. Reporting all injury or illness."

    d. This training was never given to Mr. Sanzo.

e. *Before any such training had been given*, the Defendants asked the Plaintiff to acknowledge provision fifteen, which states, "The Captain has instructed me on environmental management policies related to this trip and I certify that I have been trained and read the 'Vessel EMS Trip Start Training Card" and agree to adhere to the policies contained therein."

f. This training was never given to Mr. Sanzo.

185. Asking Mr. Sanzo to agree to obvious falsehoods rendered this entire writing procedurally and substantively unconscionable.

186. The document titled "Continuing Crew Terms of Employment for All Voyages" contains provision seventeen which pertains to the arbitration of claims arising out of employment.

187. Provision seventeen asserts that "disputes relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this arbitration clause, shall be determined by one arbitrator sitting in Boston, Massachusetts."

188. Provision seventeen states "The fee for arbitration, *except the cost of any dispute concerning the enforceability of this Agreement or appeal of the arbitrator's decision*, shall be borne by the Vessel's owner or Operator/employer as they may amongst themselves decide" (emphasis added). This term violates the U.S. Supreme Court's holding in Garrett v. Moore-McCormack Co., 317 U.S. 239 (1942), which imposes the burden on the Defendants of establishing the validity and enforceability of the release. "We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without

28

deception or coercion, and that it was made by the seaman with full understanding of his rights." <u>Garrett</u>, 317 U.S. at 248.

189.  This burden shifting term renders provision seventeen and this entire writing procedurally and substantively unconscionable.

190.  The document titled "Acknowledgment of Crew Terms" stated that the signatory was given the "Continuing Crew Terms of Employment for All Voyages" document, described that document as an "employment contract," and stated that the signatory is able to read English or have another person read "Continuing Crew Terms of Employment for All Voyages" to them.

191.  The document titled "Acknowledgment of Crew Terms" was signed by Kevin Krauss of ATLANTIC CAPES FISHERIES, INC., and Mr. Sanzo.

192.  The Defendants, by way of their counsel, have asserted that such documents constitute evidence of Plaintiff Richard Sanzo's pre-injury contractual agreement to arbitrate all claims arising out of his employment by Defendants.

193.  The Plaintiff disputes and raises defenses against the enforcement of any part of these writings against him.

194.  The Defendants, by way of their counsel, have made clear Defendants' intent to enforce these pre-injury writings against Mr. Sanzo so that Mr. Sanzo's claims are sent to arbitration and not tried to a jury.

195.  The Plaintiff wants to try his claims to a jury.

196.  Plaintiff seeks a declaration that Defendants' documents do not constitute an enforceable contractual agreement to arbitrate Mr. Sanzo's claims.

197.  This court has the authority to issue such a declaration under M.G.L. c. 231A because Mr. Sanzo is a real party in interest and an actual controversy has arisen between the parties as to the rights of the parties related to these two writings. M.G.L. c. 231A, §2.

198.  And, pursuant to M.G.L. c. 251 §2(b), this court may issue an order to stay a threatened arbitration when it finds that there is no agreement to arbitrate.

199.  As grounds for declaratory judgment against the defendants, the Plaintiff states:

   a.  An enforceable contract does not exist where there is no meeting of the minds.

   b.  An enforceable contract does not exist where it is not the product of good faith and fair dealing.

   c.  An enforceable contract does not exist where consideration is illusory.

   d.  An enforceable contract does not exist where there is procedural and substantive unconscionability.

   e.  The arbitration provision itself is procedurally and substantively unconscionable.

   f.  The arbitration provision of the writing cannot be severed from the remainder of the writings to be made enforceable.

   g.  These writings do not give rise to an arbitration agreement enforceable under the substantive maritime law.

      i.  "They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and

30

cestuis que trust with their trustees… If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that protanto the bargain ought to be set aside as inequitable… And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.'" <u>Garrett v. Moore-McCormack Co.</u>, 317 U.S. 239, 246–47 (1942), citing <u>Harden v. Gordon</u>, 11 Fed.Cas. No. 6047, at pp. 480, 485 (1823).

ii. Allowing Massachusetts law about the enforceability of arbitration agreements in employment contracts to apply here would "work[ ] material prejudice to the characteristic features of the general maritime law [and] interfere[ ] with the proper harmony and uniformity of that law in its international and interstate relations." <u>Am. Dredging Co. v. Miller</u>, 510 U.S. 443, 447 (1994), citing <u>Southern Pacific Co. v. Jensen</u>, 244 U.S. 205, 216 (1917).

h. Compelling Mr. Sanzo to arbitrate all of his claims against Defendants because of a pre-injury writing violates the Merchant Marine Act of 1920, otherwise known as the Jones Act. 46 U.S.C. §30104.

i. "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to

bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section." 46 U.S.C. §30104(a).

    ii. Compelling Mr. Sanzo to arbitrate all of his claims against Defendants because of a pre-injury writing violates 45 U.S.C. §55, which is incorporated into the Jones Act by 46 U.S.C. §30104(a). "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void…" 45 U.S.C. §55.

i.  Compelling Mr. Sanzo to arbitrate all of his claims against Defendants because of a pre-injury writing violates the Savings to Suitors clause of 28 U.S.C. § 1333. <u>Lewis v. Lewis & Clark Marine, Inc.</u> 531 U.S. 438 (2001).

j.  These writings do not give rise to an enforceable arbitration agreement because such enforcement would violate Mr. Sanzo's jury trial rights under the U.S. Constitution.

    i. "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

k.  These writings do not give rise to an enforceable arbitration agreement because such enforcement would violate Mr. Sanzo's jury trial rights under the Massachusetts Constitution and Declaration of Rights.

  i.  "In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherways used and practiced, the parties have a right to a trial by jury; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners' wages, the legislature shall hereafter find it necessary to alter it." Mass. Const. art. XV.

l.  These writings do not give rise to an arbitration agreement enforceable under the Federal Arbitration Act.

m.  These writings do not give rise to an arbitration agreement enforceable under the Massachusetts Arbitration Act because the area of law - which is contracts of employment of seamen and seamen's disputes with their employers - has been pre-empted by federal statutory law.

  i.  This area of law has been pre-empted by the Savings to Suitors clause of 28 U.S.C. § 1333. Lewis v. Lewis & Clark Marine, Inc. 531 U.S. 438 (2001).

  ii.  This area of law has been pre-empted by the Merchant Marine Act of 1920, otherwise known as the Jones Act. 46 U.S.C. §30104.

  iii.  This area of law has been pre-empted by 45 U.S.C. §55, which is incorporated into the Jones Act by 46 U.S.C. §30104(a).

iv. The Federal Arbitration Act, passed in 1925, explicitly excluded contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce. 9 U.S.C. § 1. Congress enacted this exemption to avoid unsettling then-existing dispute-resolution schemes covering those workers, including the then established statutory dispute-resolution scheme covering seamen under the Shipping Commissioners Act of 1872.

v. This area of law has been pre-empted by the Shipping Commissioners Act of 1872, ch. 322, §§ 25-26, 17 Stat. 262, 267, codified as amended, 46 U.S.C. §§ 651-652 (1925), which only allowed seamen to enter into agreements to arbitrate claims related to their employment *after* a dispute had arisen. The Donna Lane, 299 F. 977, 982 (W.D. Wash. 1924).

vi. "It is well settled that contracts providing, before the dispute arises, for arbitration, and making the award of the arbitrator conclusive, are void... When applied to a contract of seamen's wages, the rule is all the more to be enforced. Sailors are wards of the admiralty, and the courts jealously protect their rights. It is notorious that sailors, when about to sign up for a new voyage, are usually destitute, and will agree to any stipulation in the shipping articles, without giving its probable effect the slightest consideration." The Howick Hall, 10 F.2d 162, 163 (E.D. La. 1925).

vii. In 1979, Congress ended the use of shipping commissioners in an attempt to cut costs. Department of Transportation and Related Agencies Appropriation Act, 1980, Pub. L. No. 96-131, 93 Stat. 1023, 1024 (1979). "The Committee has also attempted to address antiquated or costly Federal regulations which contribute little, if anything, to the effective movement of goods and people. Two examples are the recommended prohibitions on funding for shipping commissioners, currently required by an 1872 law to attend the sign-on and discharge of crews on U.S. merchant-ships, and for the retrofit of existing fixed rail transit systems..." H.R. Rep No. 96-272, at 3 (1979).

viii. Allowing Massachusetts law about the enforceability of arbitration agreements in employment contracts to apply here would "work[ ] material prejudice to the characteristic features of the general maritime law or interfere[ ] with the proper harmony and uniformity of that law in its international and interstate relations." Am. Dredging Co. v. Miller, 510 U.S. 443, 447 (1994), citing Southern Pacific Co. v. Jensen, 244 U.S. 205, 216 (1917).

ix. This area of law has been pre-empted by Congress's pervasive scheme of federal regulation implicitly precluding the state regulation the arbitration of seamen's disputes with employers, vessels, and vessel owners.

n. Delegating the determination of validity and enforceability of these writings to an arbitrator would violate Plaintiff's rights under all sources of law cited and all defenses raised in this paragraph 199 and all of its subparts.

o. Delegating the determination of validity and enforceability of these writings to an arbitrator would violate the U.S. Supreme Court's holding in <u>Garrett v. Moore-McCormack Co.</u>, 317 U.S. 239 (1942) which imposes the burden of establishing the validity and enforceability of a seaman's release on the seaman's employers.

200. For the reasons stated in the above paragraphs, Plaintiff seeks a declaration that Defendants' documents do not constitute an enforceable contractual agreement to waive or limit Mr. Sanzo's rights to Maintenance and Cure.

201. This court has the authority to issue such a declaration under M.G.L. c. 231A because Mr. Sanzo is a real party in interest and an actual controversy has arisen between the parties as to the rights of the parties related to these two writings. M.G.L. c. 231A, §2.

202. For the reasons stated above in the above paragraphs, Plaintiff seeks a declaration that Defendants' documents do not constitute an enforceable contractual agreement to waive or limit Mr. Sanzo's rights to bring an action against Defendants under the doctrine of Unseaworthiness.

203. This court has the authority to issue such a declaration under M.G.L. c. 231A because Mr. Sanzo is a real party in interest and an actual controversy has arisen between the parties as to the rights of the parties related to these two writings. M.G.L. c. 231A, §2.

204. For the reasons stated in the above paragraphs, Plaintiff seeks a declaration that Defendants' documents do not constitute an enforceable contractual agreement to compel Mr. Sanzo to settle his claims and that he has not waived or limited his right to dispute his damages and the liability of any party.

205. This court has the authority to issue such a declaration under M.G.L. c. 231A because Mr. Sanzo is a real party in interest and an actual controversy has arisen between the parties as to the rights of the parties related to these two writings. M.G.L. c. 231A, §2.

**WHEREFORE**, Plaintiff, Richard Sanzo, respectfully prays that this court enter declaratory judgment for the Plaintiff and against the Defendants, with respect to the writings signed by Richard Sanzo on March 2, 2021, finding that these writings do not give rise to an enforceable agreement to waive/limit/modify any of Mr. Sanzo's rights to pursue his Jones Act, Unseaworthiness, Negligence, and Maintenance and Cure claims in a court of law and try them to a jury, and not in front of an arbitrator, and such writings do not compel Mr. Sanzo to first dispute the validity and enforceability of such writings in front of an arbitrator. The Plaintiff requests an expedited trial to prove up all facts relevant to the issues raised in this Count, and requests that this court enter any such further relief that the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all claims so triable. Plaintiff is entitled to a trial by jury pursuant to the "savings to suitors" clause, 28 U.S.C. § 1333, which preserves common law remedies of a maritime claimant, including the right to trial by jury.

Respectfully submitted,
Plaintiff, Richard Sanzo
By his attorneys,


/s/James Hasson
Michael B. Flynn, Esq. BBO No. 559023
mflynn@flynnwirkus.com
James G. Hasson, Esq. BBO No. 705436
jhasson@flynnwirkus.com
Flynn | Wirkus P.C.
350 Granite Street, Suite 1024
Braintree, MA 02184
P: (617) 773 5500
F: (617) 773 5510

Dated: February 20, 2024

# Exhibit A

*Atlantic Harvesters, LLC– VESSEL OPERATOR*      Date: 2-2-21

*F/V Enterprise*

## CONTINUING CREW TERMS OF EMPLOYMENT FOR ALL VOYAGES

**THIS AGREEMENT IS MADE BETWEEN THE UNDERSIGNED AND THE VESSEL[S] OWNER[S] AND OPERATOR/EMPLOYER.**

**THE UNDERSIGNED CREW MEMBER AGREES TO THE FOLLOWING TERMS AND CONDITIONS:**

1. I understand and agree that I am a self-employed fishermen and I am solely responsible for paying my own state, federal and local taxes.

2. I understand that I have been hired by the Captain and can be dismissed by the Captain at any time, in his sole discretion.  **Also, at the conclusion of any trip, the Captain shall have the right to dismiss me with or without cause.**

3. I understand and agree that I have been hired by the Captain and that the Captain and crew are working for a percentage (%) of the catch, less certain expenses, including but not limited to fuel, oil, food, packaging, and consumables.  My full, or part, share shall be determined solely by the Captain at the time of settlement. My full or part share shall be paid at the end of the trip based on my position, duties, and my performance of the duties assigned to me by the Captain, and my cooperation and coordination with the rest of the crew.

4. I authorize the vessel to withhold from my gross share, advances for travel, gear, cigarettes, and other personal consumables.  I understand that only the Captain can authorize advances to the crew.

5. I understand the vessel homeports in **FAIR HAVEN, MASSACHUSETTS,** but that the vessel may from time to time offload in other ports. I understand and agree that it is my sole responsibility and cost to arrange transportation to and from the vessel and to be at the vessel at the time directed by the Captain.

6. I understand and agree it is the responsibility of the crew to offload and pack out the vessel, clean the vessel's exterior, fish-hold, and interior, and to completely maintain the vessel to the satisfaction of the Captain.  I agree that I will not put any pins, nails, tape or other material into the walls of the vessel for personal belongings.

7. I understand and agree that following the vessel's mooring and offload, the captain may release me from duty and permit me to leave the vessel. Once I leave the vessel, I understand and agree that I, and not the vessel's captain, am solely responsible for my activities and actions. I agree to return to the vessel sober, drug free and fit for duty and that my employment will resume only after I have returned to the vessel fit to perform my duties. If I decide to leave the vessel at the end of the trip, I agree to give notice to the Captain so that a replacement can be found.

8. I certify that I am more than eighteen (18) years of age and have full knowledge and understanding of the dangers involved with ocean fishing and the handling of fishing equipment.  I certify that I am physically able to perform the duties of a crewmember aboard a scallop/fish trawler and have no current injury, illness or other condition which would prevent me, or limit me, in performing my assigned duties.

Initials: *RS*

1

Date Filed 2/20/2024 5:29 PM
Superior Court - Bristol
Docket Number

Manifest v20200831

9. I certify that I have no prior injury, illness, or condition except as I have noted under my name below. I understand that I must be fit for my assigned duties and that I must report all current and prior injury, illness or condition that could affect my ability to perform my duties, to the vessel operator. I understand that if I fail to disclose any injury, illness, or condition, I may be denied payment of any claim related to a non-disclosed prior injury or illness.

10. I further certify that I have not filed any claims against a former employer, or a vessel owner or operator, except as I have noted under my name below. I have familiarized myself with the vessel, its equipment and safety procedures and based upon my experience, I find that the vessel is fit for its intended fishery and waters.

11. I certify I am drug and alcohol free and will not bring drugs or alcohol on board the vessel, or report for duty under the influence of drugs or alcohol. As a condition of fishing, and in the event of an accident, I consent to submit to drug and alcohol testing upon the request of the vessel owner or operator.

12. I agree to comply with all fishing, navigation, customs and criminal laws while in the service of the vessel and to indemnify owner and vessel operator for any fine or penalty imposed on them as a result of the violation in which I knowingly participated.

13. It is my understanding that the Captain is responsible for the operation of the vessel and the safety of the crew. I understand that it is my duty to assist the Captain and other crewmembers to work safely. Toward this end, I may be penalized or paid a partial share as determined by the Captain if:
    A. I refuse to work on the vessel during the trip; or
    B. I bring or have dangerous weapons or intoxicants (i.e. firearms, illegal drugs, liquor); or
    C. I leave the vessel without the Captain's permission before the trip is over, or after being granted leave, fail to return at the time designated by the Captain or mate; or
    D. I delay or hinder the vessel or otherwise do not fully perform my duties; or
    E. I fight or cause trouble/disruption of any kind during the trip.

14. The Captain has instructed me and I certify that I completely understand the vessel's safety procedures and location and use of safety equipment including the following:

    A. Life raft locations and operations;        F. Location of First Aid Kit;
    B. Survival suit location and use;           G. Rough weather procedures;
    C. General alarm, fire, emergency signals, abandon ship signal;    H. Flooding procedures;
    D. Distress radio calls;                  I. Procedures for man overboard;
    E. Firefighting;                      J. Reporting all injury or illness.

15. The Captain has instructed me on environmental management policies related to this trip and I certify that I have been trained and read the "**Vessel EMS Trip Start Training Card**" and agree to adhere to the policies contained therein.

16. Injuries: I understand and agree that I must report any injury, or illness to the Captain and vessel operator immediately upon occurrence. **If I am injured, I authorize the vessel owner and operator to obtain a drug and alcohol test as they may demand post-injury.** Failure to give written notice to the Captain with seven (7) days of an injury or illness shall release the vessel operator and vessel owner from any obligation to pay maintenance and cure. In the event of an injury or illness, I agree to cooperate fully in my recovery and to reach an amicable settlement with the vessel owner and operator.

Initials: *RS*

Manifest v20200831

**17. Arbitration:** I understand and agree that any dispute, claim or controversy arising out of my work as a crewmember, including but not limited to statutory Jones Act claims, negligence, unseaworthiness, maintenance and cure, and wage claims, and whether such claim or controversy be brought against the vessel, vessel owner[s] or vessel operator/employer, or any related or affiliated company; or disputes relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this arbitration clause, shall be determined by one arbitrator sitting in Boston, Massachusetts.

The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. If this agreement to arbitrate is determined to be exempt from enforcement under the Federal Arbitration Act, the laws of the state wherein the vessel homeports shall be applied in determining the validity and enforceability of this agreement.

**ARBITRATION SHALL BE MY EXCLUSIVE REMEDY AND I UNDERSTAND THAT I GIVE UP MY RIGHT TO SUE. I FURTHER UNDERSTAND AND AGREE THAT I GIVE UP MY RIGHT TO SELECT THE VENUE FOR ANY CLAIM OR CONTROVERSY AND THAT I GIVE UP MY RIGHT TO TRIAL BY JUDGE OR JURY FOR ANY AND ALL CLAIMS, INCLUDING BUT NOT LIMITED TO STATUTORY JONES ACT, NEGLIGENCE, MAINTENANCE AND CURE, UNSEAWORTHINESS, AND WAGES.**

The fee for arbitration, except the cost of any dispute concerning the enforceability of this Agreement or appeal of the arbitrator's decision, shall be borne by the Vessel's owner or Operator/employer as they may amongst themselves decide. Each party shall be responsible for their own attorney fees and costs and lay and expert witness fees and costs, unless contrary to law. Judgment on the Arbitration Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction; however, each party shall bear its own costs in pursuing such remedies.

I have read, understand and agree to the terms this Agreement, consisting of three pages. By signing below, I acknowledge that I have been given time to review this Agreement, that I have read (or otherwise understand) and agree to its terms, and that I make this Agreement freely and voluntarily.
I further understand that the terms of this Agreement shall remain valid throughout my employment, *are not limited to the vessel set forth above, but apply to all vessels and voyages*, and shall survive termination of my employment.

**PLEASE <u>COMPLETELY</u> AND <u>LEGIBLY</u> FILL IN ALL BLANKS BELOW. IF YOU HAVE NO PRIOR EMPLOYMENT CLAIMS OR MEDICAL HISTORY, PLACE "N/A" ON THAT LINE.**

NAME *Richard Sanzo*   SS# *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*   PHONE *757 503 7962*

ADDRESS *1626*

NEXT OF KIN *Charles Sanzo*   RELATION *Son*   PHONE *757-503-7902*

CLAIMS/MEDICAL HISTORY *N/A*

SIGNATURE *(signature)*

Initials: *RS*

# Exhibit B



ACKNOWLEDGMENT OF CREW TERMS

I, _Richard Soares_ [PRINT NAME] hereby acknowledge that on this

_2_ day of _March_ 20 _21_ I was given a document entitled

"CONTINIUING CREW TERMS OF EMPLOYMENT FOR ALL VOYAGES", which consisted of three

pages and a signature page, and contain important terms and conditions of my employment, as

it is my employment contract. I confirm that I can read the English language, and will read the

document _RS_ [initial], or I will have someone read it to me _RS_ [initial].

_Witness_

_Crewmember_

# Exhibit A

*Atlantic Harvesters, LLC– VESSEL OPERATOR*      Date: 2-2-21

F/V _Enterprise_

## CONTINUING CREW TERMS OF EMPLOYMENT FOR ALL VOYAGES

**THIS AGREEMENT IS MADE BETWEEN THE UNDERSIGNED AND THE VESSEL[S] OWNER[S] AND OPERATOR/EMPLOYER.**

**THE UNDERSIGNED CREW MEMBER AGREES TO THE FOLLOWING TERMS AND CONDITIONS:**

1. I understand and agree that I am a self-employed fishermen and I am solely responsible for paying my own state, federal and local taxes.

2. I understand that I have been hired by the Captain and can be dismissed by the Captain at any time, in his sole discretion. **Also, at the conclusion of any trip, the Captain shall have the right to dismiss me with or without cause.**

3. I understand and agree that I have been hired by the Captain and that the Captain and crew are working for a percentage (%) of the catch, less certain expenses, including but not limited to fuel, oil, food, packaging, and consumables. My full, or part, share shall be determined solely by the Captain at the time of settlement. My full or part share shall be paid at the end of the trip based on my position, duties, and my performance of the duties assigned to me by the Captain, and my cooperation and coordination with the rest of the crew.

4. I authorize the vessel to withhold from my gross share, advances for travel, gear, cigarettes, and other personal consumables. I understand that only the Captain can authorize advances to the crew.

5. I understand the vessel homeports in **FAIR HAVEN, MASSACHUSETTS,** but that the vessel may from time to time offload in other ports. I understand and agree that it is my sole responsibility and cost to arrange transportation to and from the vessel and to be at the vessel at the time directed by the Captain.

6. I understand and agree it is the responsibility of the crew to offload and pack out the vessel, clean the vessel's exterior, fish-hold, and interior, and to completely maintain the vessel to the satisfaction of the Captain. I agree that I will not put any pins, nails, tape or other material into the walls of the vessel for personal belongings.

7. I understand and agree that following the vessel's mooring and offload, the captain may release me from duty and permit me to leave the vessel. Once I leave the vessel, I understand and agree that I, and not the vessel's captain, am solely responsible for my activities and actions. I agree to return to the vessel sober, drug free and fit for duty and that my employment will resume only after I have returned to the vessel fit to perform my duties. If I decide to leave the vessel at the end of the trip, I agree to give notice to the Captain so that a replacement can be found.

8. I certify that I am more than eighteen (18) years of age and have full knowledge and understanding of the dangers involved with ocean fishing and the handling of fishing equipment. I certify that I am physically able to perform the duties of a crewmember aboard a scallop/fish trawler and have no current injury, illness or other condition which would prevent me, or limit me, in performing my assigned duties.

Initials: _RS_

1

Manifest v20200851

9. I certify that I have no prior injury, illness, or condition except as I have noted under my name below. I understand that I must be fit for my assigned duties and that I must report all current and prior injury, illness or condition that could affect my ability to perform my duties, to the vessel operator. I understand that if I fail to disclose any injury, illness, or condition, I may be denied payment of any claim related to a non-disclosed prior injury or illness.

10. I further certify that I have not filed any claims against a former employer, or a vessel owner or operator, except as I have noted under my name below. I have familiarized myself with the vessel, its equipment and safety procedures and based upon my experience, I find that the vessel is fit for its intended fishery and waters.

11. I certify I am drug and alcohol free and will not bring drugs or alcohol on board the vessel, or report for duty under the influence of drugs or alcohol. As a condition of fishing, and in the event of an accident, I consent to submit to drug and alcohol testing upon the request of the vessel owner or operator.

12. I agree to comply with all fishing, navigation, customs and criminal laws while in the service of the vessel and to indemnify owner and vessel operator for any fine or penalty imposed on them as a result of the violation in which I knowingly participated.

13. It is my understanding that the Captain is responsible for the operation of the vessel and the safety of the crew. I understand that it is my duty to assist the Captain and other crewmembers to work safely. Toward this end, I may be penalized or paid a partial share as determined by the Captain if:
    A. I refuse to work on the vessel during the trip; or
    B. I bring or have dangerous weapons or intoxicants (i.e. firearms, illegal drugs, liquor); or
    C. I leave the vessel without the Captain's permission before the trip is over, or after being granted leave, fail to return at the time designated by the Captain or mate; or
    D. I delay or hinder the vessel or otherwise do not fully perform my duties; or
    E. I fight or cause trouble/disruption of any kind during the trip.

14. The Captain has instructed me and I certify that I completely understand the vessel's safety procedures and location and use of safety equipment including the following:

| | |
|---|---|
| A. Life raft locations and operations; | F. Location of First Aid Kit; |
| B. Survival suit location and use; | G. Rough weather procedures; |
| C. General alarm, fire, emergency signals, abandon ship signal; | H. Flooding procedures; |
| D. Distress radio calls; | I. Procedures for man overboard; |
| E. Firefighting; | J. Reporting all injury or illness. |

15. The Captain has instructed me on environmental management policies related to this trip and I certify that I have been trained and read the "**Vessel EMS Trip Start Training Card**" and agree to adhere to the policies contained therein.

16. Injuries: I understand and agree that I must report any injury, or illness to the Captain and vessel operator immediately upon occurrence. **If I am injured, I authorize the vessel owner and operator to obtain a drug and alcohol test as they may demand post-injury.** Failure to give written notice to the Captain with seven (7) days of an injury or illness shall release the vessel operator and vessel owner from any obligation to pay maintenance and cure. In the event of an injury or illness, I agree to cooperate fully in my recovery and to reach an amicable settlement with the vessel owner and operator.

Initials: *R S*

2

Manifest v20200831

**17. Arbitration:** I understand and agree that <u>any</u> dispute, claim or controversy arising out of my work as a crewmember, including but not limited to statutory Jones Act claims, negligence, unseaworthiness, maintenance and cure, and wage claims, and whether such claim or controversy be brought against the vessel, vessel owner[s] or vessel operator/employer, or any related or affiliated company; or disputes relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this arbitration clause, shall be determined by one arbitrator sitting in Boston, Massachusetts.

The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. If this agreement to arbitrate is determined to be exempt from enforcement under the Federal Arbitration Act, the laws of the state wherein the vessel homeports shall be applied in determining the validity and enforceability of this agreement.

**ARBITRATION SHALL BE MY EXCLUSIVE REMEDY AND I UNDERSTAND THAT I GIVE UP MY RIGHT TO SUE. I FURTHER UNDERSTAND AND AGREE THAT I GIVE UP MY RIGHT TO SELECT THE VENUE FOR ANY CLAIM OR CONTROVERSY AND THAT I GIVE UP MY RIGHT TO TRIAL BY JUDGE OR JURY FOR ANY AND ALL CLAIMS, INCLUDING BUT NOT LIMITED TO STATUTORY JONES ACT, NEGLIGENCE, MAINTENANCE AND CURE, UNSEAWORTHINESS, AND WAGES.**

The fee for arbitration, except the cost of any dispute concerning the enforceability of this Agreement or appeal of the arbitrator's decision, shall be borne by the Vessel's owner or Operator/employer as they may amongst themselves decide. Each party shall be responsible for their own attorney fees and costs and lay and expert witness fees and costs, unless contrary to law. Judgment on the Arbitration Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction; however, each party shall bear its own costs in pursuing such remedies.

I have read, understand and agree to the terms this Agreement, consisting of three pages. By signing below, I acknowledge that I have been given time to review this Agreement, that I have read (or otherwise understand) and agree to its terms, and that I make this Agreement freely and voluntarily.
I further understand that the terms of this Agreement shall remain valid throughout my employment, *are not limited to the vessel set forth above, but apply to all vessels and voyages*, and shall survive termination of my employment.

**PLEASE <u>COMPLETELY</u> AND <u>LEGIBLY</u> FILL IN ALL BLANKS BELOW. IF YOU HAVE NO PRIOR EMPLOYMENT CLAIMS OR MEDICAL HISTORY, PLACE "N/A" ON THAT LINE.**

NAME _Richard Sanzo_     SS# _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_   PHONE _757 503 7962_

ADDRESS _1626_

NEXT OF KIN _Charles Sanzo_   RELATION _Son_   PHONE _757-503-7902_

CLAIMS/MEDICAL HISTORY _N/A_

SIGNATURE _[signature]_

Initials: _RS_

3

# Exhibit B



## ACKNOWLEDGMENT OF CREW TERMS

I _Richard Servoo_ [PRINT NAME] hereby acknowledge that on this

_2_ day of _March_, 20 _21_, I was given a document entitled

"CONTINIUING CREW TERMS OF EMPLOYMENT FOR ALL VOYAGES", which consisted of three

pages and a signature page, and contain important terms and conditions of my employment, as

it is my employment contract. I confirm that I can read the English language, and will read the

document _RS_ [initial], or I will have someone read it to me _RS_ [initial].

_____
Witness

_____
Crewmember